**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 16-CR-1530-GPC |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING MOTION TO SUPPRESS POST-ARREST** |
| | ) | **STATEMENTS AND MOTIONS TO** |
| vs. | ) | **SUPPRESS EVIDENCE** |
| | ) | |
| VICTORIA IRACEMA LEININGER, | ) | [ECF Nos. 11 and 20] |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Defendant Victoria Iracema Leininger ("Defendant") has moved to suppress her post-arrest statements, cell phone evidence and jail calls. Def. Mot., ECF Nos. 11, 20. The United States has opposed. Gov't Opp., ECF Nos. 15, 19. An evidentiary hearing was held on September 30, 2016. Upon consideration of the filed papers, testimony adduced at the hearing and the applicable law, and for the reasons set forth

below, the Court hereby **DENIES** the motions to suppress.

**FACTS**

**A. Arrest and Interview**

On April 14, 2016, at approximately 2:25 p.m., Defendant Leininger applied for admission into the United States through the vehicle lanes at the Andrade, California, Port of Entry ("POE"). *See* Compl. at 3, *United States v. Leininger,* 16-mj-8334, ECF No. 1.  Leininger was driving a 2000 Nissan Xterra and was accompanied by two of her minor children. *Id.* Customs and Border Protection ("CBP") Officer Hinojoza referred Defendant's vehicle to secondary inspection. *Id*. During secondary inspection, CBP Officer Walter found four packages of methamphetamine in the front passenger and driver's seat, and CBP Officer Dunstan found twenty-four packages of methamphetamine in the rear quarter panels of Defendant's vehicle.

In response to the seizure, Homeland Security Investigations ("HSI") Special Agents ("SAs" or "Agents") Craig Moore and Matthew Parker proceeded to the Andrade POE offices where they observed Leininger sitting on a bench with her two children, ages 5 and 2, in the passport secondary office. Leininger was asked if she wanted one of the officers to call anyone to pick her children. Leininger asked the officers to contact the father of the children, Jairo (later identified as Jose De Jesus Ugalde Salgado ("Jairo")), to pick up the children. Def.

2

Mot., Ex. B, Leininger Dec. ¶ 8.  In her declaration she states that she had no other

options. *Id.*  She further claims that she was worried about her children's safety

based on prior interactions she had with Jairo. *Id.* at ¶ 10.  A short time later and

prior to interviewing the defendant, Jairo arrived at the Port of Entry and took

custody of the children at Defendant's request. Leininger Decl. ¶¶ 7, 17. The

children reportedly appeared fine and were not hesitant to leave with their father.

Later, at approximately 4:40p.m., Leininger was moved from the passport

secondary office into an HSI interview room. The standard interview room had

carpeting, cushioned chairs, a telephone, a small table and a window with blinds.

Special Agent Moore identified himself to Ms. Leininger and took her biographical

information in English. After it became apparent that Ms. Leininger had a limited

ability to speak English, a Spanish speaking agent, CBP Officer Hinojoza, was

called to interpret.

At approximately 5:03 p.m., Defendant was advised of her Miranda rights in

Spanish by Officer Hinojoza.  At this time, the defendant was handcuffed and

seated in a cushioned chair across the room from CPB Officer Hinojoza, and

Special Agents Moore and Parker. CBP Officer Hinojoza was wearing her standard

uniform, and the Special Agents were in casual civilian attire. Officer Hinojoza

provided and explained Defendant's rights to her.

After being read her *Miranda* rights, the agent asked, "Do you have any

questions?" Ms. Leininger responded "No, everything is clear." *See* Post-Arrest Tr., ECF No. 11-2 at 4; DVD of Interview, Ex. 1. Special Agent Parker then handed Leininger a Declaration of Rights form listing each *Miranda* right in Spanish and an acknowledgement and waiver of rights on the bottom half of the page. As this was occurring, Leininger started to ask Officer Hinojoza a question, but Hinojoza proceeded to describe for Leininger that the Spanish written form just handed to her contained what had just been explained to her. *Id*. at 5. Officer Hinojoza then asked Leininger, "Were you going to say something?" and Leiniger said, ""Yes, um…If I talk…um…" At that time, the agent pointed to name and signature line on the written form. *Id*. Officer Hinojoza then responded to a page over the intercom. *Id*. Less than a minute later, Officer Hinojoza returned and the following exchange occurred between Officer Hinojoza and Ms. Leininger in Spanish:

> **Hinojoza:** First, what were you going to say?
>
> **Defendant:** Um… If I talk, um, are my children going to be protected? Um ...as long as I'm here?
>
> **Hinojoza:** I don't understand. Protected from what?
>
> **Defendant:** And my husband, the children's father.

*See id.* at 6.

Officer Hinojoza interpreted Defendant's question to Special Agent Moore,

and he responded in English that he couldn't guarantee it because he wasn't with her kids and that was a decision she needed to make if she wanted to help her situation. Officer Hinojoza then told the defendant the following:

> **Hinojoza:** He (Agent Moore) can't promise you or guarantee you because he's not by the children's side. He says but this is a decision you have to make if you want to help in your case. Because how much time you get and your document and all that will also depend on that. On your participation.
>
> **Leininger**: [UI]
>
> **Hinojoza**: [Agent] says for you to start from the beginning. He says do you understand you had 18 kilos of crystal in the car? Did you know that?
>
> **Leininger**:  I was only going to pick up money.

*Id.* at 6.

In the video recorded interview, Defendant appears calm and does not appear emotional in response to the agent's answer to her question regarding her children. After the agents answered the question, Leininger did not have any follow up questions and did not hesitate answering questions regarding her case.

During the fifty-three minute interview, Defendant allegedly admitted that she had been paid to smuggle bulk cash on five prior occasions and thought she might also have been transporting methamphetamine because she previously found shards of methamphetamine in her vehicle after supposedly transporting bulk cash.

Throughout the interview, the agents and officer are seated and appear and sound calm. No guns were drawn or displayed. The transcript reveals no threats were made regarding Defendant's children, husband or case.

### B. Cell Phone Search Warrant

On August 10, 2016, Defendant Leininger requested cell phone evidence and was informed by the United States that the phone had not been searched yet, but a warrant would be sought in order to see if the phone had any further information other than the phone number used by one of Defendant's handler's identified during her post-arrest interview.

On August 18, 2016, Agent Parker applied for a search warrant to search the cell phone. ECF No. 15. The affidavit's factual justification for searching the cellphones was that, based on the facts recited above, Parker believed that Leininger "used the cellular phone to coordinate with co-conspirators regarding the transportation and delivery of the methamphetamine and bulk cash, and to otherwise further this conspiracy both inside and outside of the United States," and that "recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of cellular telephones which identify other persons involved in narcotics trafficking activities." *Id.* at 22.

The warrant described the scope of the search and the statutory basis of the

16cr1530-GPC

underlying violation as follows:

> The following evidence to be searched for and seized pertains to violations of Title 21, United States Code, Sections 952 and 960 - Importation of a Controlled Substance.
>
> Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:
>
>> a. tending to indicate efforts to import controlled substances from Mexico into the United States from November 1, 2015 to April 14, 2016;
>>
>> b. tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, phone numbers – that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico into the United States from November 1, 2015 to April 14, 2016;
>>
>> c. tending to identify co-conspirators, criminal associates, or others involved in smuggling controlled substances from Mexico into the United States from November 1, 2015 to April 14, 2016;
>>
>> d. tending to identify travel to or presence at locations involved in smuggling controlled substances from Mexico into the United States, such as, but not limited to, stash houses, load houses, or delivery points;
>>
>> e. tending to identify the user of, or persons with control or access to, the subject phone from November 1, 2015 to April 14, 2016; or
>>
>> f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

*Id.* at 31.[1] The warrant was signed by Magistrate Judge Lewis on the same day the

---

[1] As justification for the scope of the search, the affidavit stated due to the development of modern technology, "i[t] is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device," since modern cell phones have many different capabilities, such as calendars, address books, and other "mini-computer[]"

affidavit was submitted, August 18, 2016. *Id.* at 32. Pursuant to the warrant, Agent

Medina returned an inventory of two copies of compact discs obtained from

forensics with cell phone data to Judge Lewis on September 30, 2016. *USA v.*

*Black and Green BLU cellular telephone, model Zoey II, IMEl1 355252066197268*

*/ IME12 355252068197266,* 16-mj-8693, ECF No. 3. On August 19, 2016, the

information seized from that search was provided to Defendant. ECF No. 20 at 4.

## DISCUSSION

## I.   MOTION TO SUPPRESS POST-ARREST STATEMENTS

Leininger argues that her *Miranda* waiver, as well as her post-arrest

statements, were involuntary because of psychological coercion and her failure to

accurately understand her rights.  ECF No. 11-1 at 2.  The Government opposes.

ECF No. 19 at 6-11.

### a.   Voluntariness of *Miranda* waiver

Leininger argues that her decisions to waive her *Miranda* rights and make

her post-arrest statements, were not voluntary, knowing, and intelligent because of

her "concern for her children's well-being and belief that her answering the agents'

questions would affect her relationship with her children."  Def. Mot., ECF No. 11

---

functions, and that since many cell phones "do not have hard drives . . . and store information in
volatile memory," not all data can be acquired "forensically," with some devices requiring "time
and labor intensive" manual review, ECF No. 15 at 24-25. The affidavit states that the data
analysis will take ninety (90) days. *Id*. at 25.

at 6.)

The government bears the burden of proving by a preponderance of the evidence that a criminal defendant knowingly, intelligently, and voluntarily waived her *Miranda* rights. *Missouri v. Seibert*, 542 U.S. 600, 608, n.1 (2004). The Court must assess the voluntariness of an admission under the "'totality of all the circumstances—both the characteristics of the accused and the details of the interrogation.'" *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (citing *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). An involuntary confession violates the Due Process Clause of the United States Constitution and is inadmissible. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). In determining whether a statement is "voluntarily made . . . the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

The facts demonstrate that Leininger is the 29-year old mother of two children that accompanied her through the Port of Entry as she attempted to import methamphetamine.  Following her arrest, Leininger was asked if she wanted the officers to call anyone to pick up her children.  She provided the contact information for her husband Jairo, the father of the two children. Based upon Leininger's request, agents contacted Jairo who traveled to the port of entry to pick

9

up the children. While the children were waiting for their father, Officer Hinojoza reported that they were not in distress or nervous.  After he arrived, Jairo told Leininger "Don't worry, you're going to be fine." Officer Hinojoza testified that Leininger showed no hesitation to having her husband pick up the children. Meanwhile, the children appeared fine and were not hesitant to leave with their father.

Leininger claims that she understood that she "had to talk to them if I wanted help in any part of my case, including protecting my children. I thought they were going to both prosecute me for a crime and take my children away from me. I felt that I had to talk to the agents in that moment to help my children."  As to her claim of her concerns for protecting her children, Leininger vaguely claims that she was worried about her children's safety based on prior unspecified interactions she had with Jairo. *Id.* at ¶ 10. She made no reference to concerns with Jairo when she asked officers to contact Jairo or when he arrived at the port of entry.  Neither did she express any concern for the children based upon prior interactions with Jairo during the interview. Further, upon Jairo's arrival, there was nothing about his behavior that suggested that the children were in danger.

In addition, nothing that the agents said or did supports the claim that the agents coerced Leininger or overcame her free will.  It is well-established that "coercive police activity is a necessary predicate to finding that a confession is not

16cr1530-GPC

'voluntary' within the meaning of the Due Process Clause of the Fourteenth

Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). The agents

arranged for the father to pick up the children and did not bring up the children

during the interview. Once Leininger expressed concern for her children, the

agents said nothing to suggest that they were going to take her children from her.

In fact, this claim is belied by the agents advising Leininger that they could not

promise that they would protect the children since the agents were not with the

children. Objectively, there is no indication that the agents deliberately preyed

upon the maternal instinct of Leininger or inculcated fear that she would not see

her children in order to elicit cooperation. Ultimately, Leininger has failed to

establish "some causal connection between the police conduct and the confession."

*United States v. Kelley,* 953 F.2d 562, 565 (9th Cir. 1992); *Mickey v. Ayers*, 606

F.3d 1223, 1234 (9th Cir. 2010)

Leininger cites *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) for the

proposition that psychological coercion was brought to bear upon her to produce

her confession.  Def. Mot. at 5. However, in *Tingle*, the totality of the

circumstances of the interrogation demonstrated that the interrogating agents were

patently coercive in their questioning as evidenced by, among other things, the

physical response of the accused.  In *Tingle,*

> Agent Sibley recited a virtual litany of the maximum penalties for the
> crimes of which Tingle was suspected, totaling 40 years

11

imprisonment. He expressly stated, in a manner that could only be interpreted in light of the lengthy sentences he had described, that Tingle would not see her two-year-old child "for a while." Referring specifically to her child, Sibley warned her that she had "a lot at stake." Sibley also told Tingle that it would be in her best interest to cooperate and that her cooperation would be communicated to the prosecutor. He also told her that if she failed to cooperate he would inform the prosecutor that she was "stubborn or hard-headed."

*Id.* at 1336.

As a result of Agent Sibley's techniques, "[d]uring Sibley's interrogation Tingle began to sob. She was noticeably shaking. She continued to cry for at least ten minutes." *Id.* at 1334. The court found that all of these aspects of the interrogation "must be read together, as they were intended to be, and as they would reasonably be understood. Viewed in that light, [the agent's] statements were patently coercive." *Id.* at 1336.

Here, there were no coercive features identified by the Ninth Circuit in *Tingle*. Leininger was not threatened with a lengthy prison term or an unfavorable report for noncooperation. At no point in the video recorded interview does Leininger appear to be shaken or emotionally distraught by the agents' statements. Defendant was never told she would not see her children for "a while" or that there was a lot at stake and that it would be in the best interest of the defendant to cooperate. Unlike *Tingle*, it cannot be said that the circumstances of the interrogation were intended to be coercive or that Leininger reasonably understood them to be coercive.

12

When Leininger asked "if I talk, um, are my children going to be protected? Um…as long as I'm here?" The officers told her they could not make that promise because the agent was not by the children's side.  She was told "this is a decision you have to make if you want to help in your case.  Because how much time you get and your document and all that will also depend on that. On your participation."  Leininger argues that the agents did not adequately answer her question and that based on the unclear answer to her question, she had every reason to believe that her confession would have a significant impact on her ability to see her children.  Def. Mot at 5.

Recognizing that there was no overt pressure placed on her to give a statement, Leininger argues that a confession may be rendered involuntary not only by express threats but also by subtle psychological coercion, which at times more effectively overbears a rational intellect and free will. However, in answering Leininger's questions, there was no subtle psychological coercion exerted by the agents. At best (or worst), the agents' answers to Ms. Leininger's vague questions were similarly unclear. Any lack of clarity in the agents' answers was the product of the Leininger's vaguely expressed concern for her children. The totality of the circumstances demonstrate that Leininger's waiver of her Miranda rights was voluntary.

///

13

16cr1530-GPC

### b. Voluntariness Under 18 U.S.C. § 3501(b)

Title 18 United States Code Section 3501(b) sets forth five factors which a court must review to determine whether a statement is voluntarily made. These factors include: (1) the time elapsing between arrest and arraignment of the defendant, (2) whether the defendant knew the nature of the offense with which she was charged at the time of making the confession, (3) whether the defendant was aware that she was not required to make any statement and that any such statement could be used against her, (4) whether the defendant had been advised of her right to counsel; and (5) whether counsel was present at the time of defendant's confession. 18 U.S.C. § 3501(b); *United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008). No one factor is necessarily conclusive on the issue of voluntariness of a confession. *Id.*

With respect to § 3501(b), four of the five statutory factors weigh in favor of finding Leininger's statement voluntary. First, Leininger has not complained of an unreasonable delay in time between her arrest and arraignment. Second, she was informed by the agents of the nature of her crime at the beginning of the interview. Third, as discussed above, the agents adequately advised Leininger of her Miranda rights; and, fourth, she was aware of her right to the presence of counsel during the interview. Fifth, while no attorney was present when Defendant gave her statement to the agents, there is no evidence that any of the statements were extracted by use

14

of threat, violence, or psychological pressure. Accordingly, this Court finds that Leininger's waiver of her Miranda rights was knowing, intelligent, and voluntary and that her statement was voluntary.

## II.    MOTION TO SUPPRESS EVIDENCE FROM BORDER SEARCH

Leininger next argues that the Government's initial warrantless search of her cell phone at the border was unreasonable and the fruits of the search should be suppressed. Supp. Def. Mot., ECF No. 20 at 10. The Government opposes asserting that the initial search at the port of entry was a legitimate border search under *United States v. Cotterman*, 709 F.3d 952, 957 (9th Cir.) (*en banc*), and that the forensic examination was conducted pursuant to a lawful search warrant.  ECF No. 19 at 12.

"Border searches form a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause." *United States v. Cotterman*, 709 F.3d at 960 (quotation omitted) (internal quotation marks omitted). At the border, "individual privacy rights are not abandoned but '[b]alanced against the sovereign's interests.'" However, the balance between those rights and interests is "struck much more favorably to the Government" owing to "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *Id.* (quotations omitted) (internal quotation marks omitted).

15

1    Leininger argues that a distinction exists between the screening of laptops or

2 phones to prevent the entry of unwanted items and "investigatory" border searches

3 and protecting the United States by preventing the "entry of unwanted persons or

4 contraband." *Id*. at 10.  However, Leininger cites no authority to support such a

5 distinction.

6    In *United States v. Cotterman*, defendant's two laptops and three digital

7 cameras were seized at the U.S.-Mexico border in response to an alert based on a

8 previous child molestation conviction. *Id*. at 956. After an initial search at the

9 border, in which defendant was detained while a border agent inspected the

10 electronic devices and found what appeared to be family and other personal photos,

11 along with several password-protected files, but no evidence of child pornography,

12 defendant was allowed to leave the border. *Id*. at 957–58. However, border agents

13 retained two laptops and one digital camera, and then shipped them to Tuscon,

14 Arizona, for a comprehensive forensic examination. *Id*. at 958. The Ninth Circuit

15 found that no particularized suspicion was necessary for the initial border search,

16 where a border agent "turned on the devices and opened and viewed image files"

17 while defendant was waiting to enter the country. *Id*. at 960 (noting that "the

18 legitimacy of the initial search of Cotterman's electronic devices at the border is

19 not in doubt"). However, reasonable suspicion was necessary for the forensic

20 examination of the laptop. *Id*. at 957. The key distinction for the Ninth Circuit lay

16

in the "comprehensive and intrusive nature of a forensic examination," wherein the laptops' hard drives were copied and then "analyze[d] in [their] entirety, including data that ostensibly had been deleted." *Id.* at 962.

The distinction drawn by the Ninth Circuit was not whether the initial border search had an "investigatory" function, but the nature and intrusiveness of the initial border search. In this case, the initial search of the cell phone performed at the border appears to have been a non-forensic scan of the cell phone's text messages of the kind conducted in the initial border search in *Cotterman*, rather than the warrantless forensic examination the Ninth Circuit subjected to more searching inquiry, which was undertaken in the present case after the warrant was issued. Thus, the initial review of the cell phone was not illegal and the Court DENIES the motion to suppress evidence derived from the border search of Defendant's cell phone.

## III.   MOTION TO SUPPRESS SEARCH WARRANT EVIDENCE

Leininger moves to suppress evidence obtained from the warrant-based search of her phone on the grounds that (1) the search warrant was a general warrant and not sufficiently particularized; (2) the search warrant did not specify a search protocol. ECF No. 20 at 6, 9. The Court will address each argument in turn.

### a.   Particularity

The Fourth Amendment provides that "no Warrants shall issue, but upon

17

probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This "specificity" requirement has been understood to have two dimensions: "particularity" and "breadth." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (quotations omitted). Both requirements "serve a common purpose: to protect privacy by prohibiting a general, exploratory rummaging in a persons [sic] belongings." *United States v Weber*, 923 F.2d 1338, 1342 (9th Cir. 1990) (quotation omitted) (internal quotation marks omitted).

Leininger argues that the warrant was insufficiently particular. ECF 20 at 6. She argues that the warrant's lack of particularity resulted in an unconstitutional general warrant, where "the items permitted to be seized in Attachment B are virtually limitless." *Id.*

Courts have generally accepted the proposition that "a search warrant authorizing the seizure of materials also authorizes the search of objects that could contain those materials." *United States v. Giberson*, 527 F.3d 862, 886 (9th Cir. 2008); *see also Andersen v. Maryland*, 427 U.S. 463, 482 n.11 (1976) (recognizing that "in searches for papers, it is certain that some innocuous documents will be

18

examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized"). The Ninth Circuit has recognized "heightened specificity concerns in the computer context, given the vast amount of data they can store." *See United States v. Adjani*, 452 F.3d 1140, 1149 (9th Cir. 2006). However, in approving a warrant authorizing search and seizure of an entire computer in an extortion case, the *Adjani* court also expressed the countervailing concern that requiring a "pinpointed computer search, restricting the search to an email program or to specific search terms, would likely have failed to cast a sufficiently wide net to capture the evidence sought." *Id.* at 1149–50.

Similarly, in *United States v. Flores*, 802 F.3d 1028, (9th Cir. 2015), the Ninth Circuit approved the search and seizure of 11,000 pages of data in defendant's Facebook account in a drug trafficking case, where only approximately 100 pages were ultimately found to be truly responsive to the warrant. *Id.* at 1045 (citing *Adjani*, 452 F.3d at 1149–50) ("'Over-seizing' is an accepted reality in electronic searching because '[t]here is no way to be sure exactly what an electronic file contains without somehow examining its contents.'") (quoting *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176–77 (9th Cir. 2010) (en banc))).

### b.   Breadth

Leininger argues that the warrant was broader than the probable cause upon

1   which it was based.

2       First, Leininger asserts that the items permitted to be seized in Attachment B

3   are virtually limitless. Def. Supp. Memo., ECF No. 20 at 6. She argues that on its

4   face the warrant illegally authorizes seizure of data "tending to" pertain to six

5   broad categories of evidence.

6       As an initial matter, the Ninth Circuit has rejected the argument that use of

7   "catch-all phrases" such as "tending to" renders a warrant per se unreasonable

8   when context adequately limited the scope of the search. In *United States v.*

9   *Reeves*, 210 F.3d 1041 (9th Cir.2000), the court held that words "may include, but

10  is not limited to," and "other items" did not make a warrant impermissibly

11  overbroad because context made clear that the search was for "evidence of the

12  possession, manufacture, and delivery of the controlled substance

13  methamphetamine." *Id*. at 1046. And in *United States v. Shi*, 525 F.3d 709 (9th Cir.

14  2008), the words "including, but not limited to" did not make a warrant

15  insufficiently particular because it authorized a search of only the limited area the

16  defendant inhabited. *See id*. at 731. In *United States v. Garcia-Alvarez*, No. 14-CR-

17  0621 JM, 2015 WL 777411, at *3 (S.D. Cal. Feb. 24, 2015), the court approved a

18  warrant for a cellphone search with "including but limited to" and "tending to"

19  language where that language was limited to searching for "information relevant to

20  drug trafficking and identifying Defendant's communications, movements, and co-

conspirators."

Here, context provided by the warrant limited the search to a specific area—the contents of Defendant's cell phones—and directed searchers to look for information relevant to drug trafficking and to identifying Defendant's communications, movements, and co-conspirators. That information bore directly on the crime for which she was arrested. *See United States v. Shi*, 525 F.3d at 731 (holding that the words "including, but not limited to" and "tend to" did not render a warrant insufficiently particular where the warrant authorized a search only of the "[b]unk space, cupboard, drawer, and two storage spaces" which the crew had told the agents belonged to the defendant).

Here, the "including but not limited to" and "tending to" language is similarly limited by the context of searching for information related to "smuggling controlled substances from Mexico to the United States," and to establishing the identity of co-conspirators and other facilities used to import controlled substances. (ECF No. 20-1 at 9.) Thus, the warrant was not more general than the probable cause upon which it was based.

### c.    Search Protocol

Finally, Leininger argues that the agents obtained a general warrant where no procedure was undertaken to segregate data, sort out the responsive data or to delete data that was not authorized to be seized under Attachment B.  ECF No. 20

21

at 9.  Defendant relies on *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), as a case that requires establishing specific procedures to avoid turning warrants for specific material into general warrants.  However, the Ninth Circuit has declined to specify a mandatory search protocol for electronic warrant-based searches. *See Garcia-Alvarez*, 2015 WL 777411 at *4.  While the Ninth Circuit has "look[ed] favorably upon the inclusion of a search protocol . . . its absence is not fatal." *See United States v. Hill*, 449 F.3d 966 (9th Cir. 2006) (declining to require a search protocol for a computer in a child pornography case); *see also United States v. Schesso*, 730 F.3d 1040 (9th Cir. 2013) (declining to require a search protocol for the search and seizure of a defendant's computer system and all of his digital storage devices in a child pornography case); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (en banc) (per curiam) (declining to adopt Judge Kozinski's concurring opinion laying out "guidance" for digital searches). Thus, the Court declines to find the absence of a search protocol rendered the search warrant a general warrant or an invalid warrant under the Fourth Amendment. Defendant's motion to suppress evidence derived from the execution of the search warrant is DENIED.

## IV.    MOTION TO SUPPRESS JAIL CALLS

On August 11, 2016, HSI Agent Moore subpoenaed Leininger's jail calls made while at the GEO Western Region Detention Facility ("GEO") through an

administrative subpoena pursuant to 21 U.S.C. § 967. Pursuant to the administrative subpoena, the Government obtained jail calls of the Defendant that were recorded while she was incarcerated at the Imperial County Jail and GEO. On August 18, 2016, Defense counsel received a DVD that contained jail calls allegedly made by Leininger while in custody.  ECF. No. 20 at 15.

Defendant Leininger moves to suppress the jail calls alleging variously that (1) the government did not act with due diligence to obtain this evidence; (2) the administrative subpoenas sought information not covered by the statute, (3) the government used the subpoena as a tool in an unauthorized fishing expedition. ECF No. 20 at 16-17.

The Government opposes arguing that (1) Defendant lacks standing, (2) the information sought related to an investigation covered by § 967 and (3) any violation of the statute does not warrant suppression.

Defendant has failed to demonstrate any prejudice resulting from the Government's alleged failure to act with due diligence in seeking the jail calls. Leininger has had the jail calls for two months and has had the opportunity to move to suppress the jail calls and to use them in preparation for trial.  In addition, there has been no showing that any delay was willful or motivated by a desire to obtain tactical advantage.  Finally, the Court finds that the production of the evidence within two weeks of being obtained by the Government does not violate

Federal Rule of Criminal Procedure 16 ("Rule 16"). Under these facts, suppression of the jail calls would be unfounded.

Second, the statute used by the Government to obtain the jail calls provides in pertinent part: [f]or the purpose of any investigation which, in the opinion of the Secretary of the Treasury, is necessary and proper to the enforcement of section 545 of Title 18 (relating to smuggling goods into the United States) with respect to any controlled substance (as defined in section 802 of this title), the Secretary of the Treasury may …require the production of records …relevant or material to the investigation." 21 U.S.C. § 967.

In the instant case, Leininger has been charged with conspiring with others to import methamphetamine into the United States. Methamphetamine is a controlled substance under section 802 of Title 21 U.S.C. While she has been charged with violating 21 U.S.C. §§ 952 and 960, smuggling methamphetamine qualifies as smuggling goods into the United States and also violates 18 U.S.C. § 545. *Cf.*, *United States v. Garcia-Paz*, 282 F.3d 1212, 1214 (9th Cir. 2002) (district court properly instructed the jury that marijuana constitutes "merchandise" for purposes of 18 U.S.C. § 545; *United States v. Caldwell*, 466 F.2d 611, 612 (9th Cir. 1972) (Review of conviction for smuggling marijuana into the United States under 18 U.S.C. § 545). The Government asserts that Defendant's jail calls further the investigation of the coconspirators by allowing the Government to determine

whether Leininger is communicating with her alleged coconspirators.

Assuming she has standing to raise this challenge, Leininger has failed to point to any authority which would find that obtaining an administrative subpoena for the Government's stated purposes falls outside of § 967 or that its overbroad use would justify suppression of the evidence. Given the language of the statute, the reported use and the absence of authority supporting Defendant's position, the motion to suppress jail calls is DENIED.

## V.      MOTION TO SUPPRESS EVIDENCE FOR RULE 16 VIOLATIONS

Leininger moves for the suppression of all evidence provided after August 5, 2016 that was reasonably available to the Government since at least June 30, 2016 on the basis that the Government violated Rule 16 by delaying the production of evidence, including cell phone data and jail calls. The Government opposes.

### a.  Factual Background

On June 30, 2016, at a motion hearing, the Court scheduled a Motion in Limine hearing for August 26, 2016, and set a trial date of September 12, 2016. The Court directed defense counsel to file motions by August 12, 2016 and for the government's response to be filed by August 24, 2016. At the hearing, Leininger stated that the government represented that all evidence (except the drugs which were being sent to the laboratory for testing) would be made available by the first week of August so that defense counsel would have adequate time to prepare

25

substantive motions. Instead the Government did not provide jail call evidence until August 18, 2016 and cell phone evidence until August 19, 2016. Defendant filed a motion to suppress evidence on August 19, 2016 and on August 26, 2016, the Court granted Leininger's motion to continue trial and rescheduled the trial for October 31, 2016. ECF Nos. 11, 17. Defendant thereafter filed a supplemental points and authorities on September 12, 2016 and a hearing on the motion was held on September 30, 2016.  ECF. Nos. 20 and 22.

### b.  Standard

Rule 16(a)(1)(E) provides that: [u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Rule 16(c) establishes a continuing duty to disclose where A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if: (1) the evidence or material is subject to discovery or inspection under this rule; and (2) the other party previously

16cr1530-GPC

1   requested, or the court ordered, its production.

2   "The trial court, when faced with a [discovery] violation ..., may 'order such

3   [offending] party to permit the discovery or inspection, grant a continuance, or

4   prohibit the party from introducing evidence not disclosed, or it may enter such

5   order as it deems just under the circumstances.'" *United States v. Gee,* 695 F.2d

6   1165, 1168 (9th Cir. 1983) (quoting Fed. R. Crim. P. 16(d) (2)). The Court is

7   vested with discretion in imposing a sanction for a failure to comply with a

8   discovery rule and the sanction "should not [be] ... harsher than necessary to

9   accomplish the goals of Rule 16." *Id.* at 1168-69 (internal quotation marks and

10  citation omitted). "Exclusion is an appropriate remedy for a discovery ... violation

11  only where 'the omission was willful and motivated by a desire to obtain a tactical

12  advantage.' " *United States v. Finley,* 301 F.3d 1000, 1018 (9th Cir. 2002) (quoting

13  *Taylor v. Illinois,* 484 U.S. 400, 415 (1988)).

14  ### c.  Discussion

15  In this case, Defendant originally requested documents and data under Rule

16  16(a)(1)(E) on June 16, 2016 and renewed the request on July 18, 2016. *United*

17  *States v. Leininger*, 16cr1067, ECF No. 16; ECF No. 7. At the time of the requests,

18  the cell phone data and the jail calls had not yet been obtained and thus there was

19  no duty to disclose until the items were obtained.

20  Leininger argues that a Rule 16 duty to produce information not yet in the

27

Government's possession was created when the government represented on June 30, 2016 that all evidence (with the exception of the drugs seized) would be made available by the first week of August so that defense counsel would have adequate time to prepare substantive motions. She continues that, instead of the first week of August, the materials were provided during the third week of August.

First, the Court observes that the Government did not violate any court order regarding the production of discovery. Second, there was no duty to turn over the requested information until it came into possession of the Government. Since it did not come into possession until August 18 (as to the jail calls) and August 19 (as to cell phone data), a discovery obligation did not exist until such time.

Rule 16 does not provide any time restrictions which demonstrates that it contemplates that discovery be provided within a reasonable time so that the Defendant has adequate time to prepare for trial. The Court finds that the evidence was produced within a reasonable period of time after it came into the Government's possession and that Defendant had the evidence sufficiently in advance of trial to permit adequate trial preparation.

Finally, there is no evidence that any failure to turn over discovery sooner was willful or motivated by a desire to obtain a tactical advantage. The delay of two weeks has not been shown to have prejudiced Defendant. Defendant has filed her motion to suppress the evidence and the challenged evidence has been made

28

16cr1530-GPC

available well before the scheduled trial on November 14, 2016.  The motion to suppress for violation of Rule 16 is DENIED.

### CONCLUSION

For the foregoing reasons, Leininger's Motions to Suppress, ECF Nos. 11, 20, are hereby **DENIED**.

**IT IS SO ORDERED.**

Dated:  November 2, 2016

Hon. Gonzalo P. Curiel
United States District Judge

16cr1530-GPC